## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

UNITED STATES OF AMERICA )
                         )

v.                      )    CRIM. NO. 16-00245-CG
                         )

DIONE PETITE           )

## UNITED STATES' RESPONSE TO PETITE'S
## REQUEST FOR EARLY RELEASE

The United States, by and through Richard W. Moore, the United States Attorney for the Southern District of Alabama, submits this response to Dione Petite's *pro se* motion seeking early release under 18 U.S.C. § 3582(c)(1)(A).  [Doc. No. 181.]  Petite's motion should be dismissed because she has not submitted a request for compassionate release to the Warden of her facility.  Alternatively, the Court should decline to reduce her sentence in its discretion.

## I.    Background and Procedural History

### A.    Indictment, Plea, and Sentence

On December 28, 2016, by superseding indictment, a grand jury charged Petite with one count of conspiracy to distribute methamphetamine (21 U.S.C. § 846) and six counts of possessing methamphetamine with the intent to distribute it (21 U.S.C. § 841(a)(1)). [Doc. No. 36.]  The same indictment charged three codefendants with the same and additional crimes.  [*Id.*]

On January 23, 2017, this Court accepted Petite's guilty plea to the conspiracy charge. [Doc. No. 65 (text-only order).] As part of a plea agreement, the United States agreed to move to dismiss the other charges against Petite and to recommend that Petite be sentenced "at the low end of the advisory guideline range per count of conviction as determined by the Court." [Doc. No. 63 at 6–7.] In addition to entering a plea of guilty to the conspiracy count, Petite agreed to waive her rights to appeal and to bring a motion under 28 U.S.C. § 2255, subject to several exceptions. [*Id.* at 12.]

Petite's pre-sentence investigation report ("PSR") calculated her offense level as 38 and her criminal history category as IV, resulting in a Guidelines range of 324 to 405 months. [Doc. No. 85 at 7, 8, 12.] The PSR included Petite's statement that she had no children and described her physical condition at the time of sentencing. [*Id.* at 10.] It said that Petite suffered from obesity, chronic back pain, and arthritis. It also reported that Petite had suffered a transient ischemic attack and had had hip replacement surgery in 2015. [*Id.*]

On May 3, 2017, this Court varied below the Guidelines range and sentenced Petite to 150 months in prison. [Doc. No. 90 at 2.] The Court recommended that BOP place Petite in a facility that could provide mental health treatment and that could meet her medical needs. [*Id.*]

Petite's projected release date is March 14, 2028. *See* bop.gov/inmateloc (Register Number 12611-003).

**B.    Petite's First Motion for Compassionate Release**

Petite previously moved for compassionate release based on her weight and various health conditions.  [Doc. No. 159 at 4.]  Her motion was procedurally proper, as she had previously submitted a request for compassionate release to the Warden of her facility.  [*See* Doc. No. 165-1.]

The Court denied her motion.  [Doc. No. 180.]  It concluded that Petite's medical conditions did not constitute an extraordinary and compelling reason to reduce her sentence.  [*Id.* at 11.]  Even if Petite qualified for compassionate release consideration, the Court said, it would "not be inclined to exercise its discretion to reduce her sentence" because she has "served only one third" of her sentence.  [*Id.*]

**C.    Bureau of Prisons' Response to the COVID-19 Pandemic**

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy.  In response to the pandemic, Bureau of Prisons ("BOP") has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority."  BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

3

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited

4

group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential

systems.  All volunteer visits are suspended absent authorization by the Deputy Director of BOP.  Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates.  In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended.  Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly-updated resource page: www.bop.gov/coronavirus/index.jsp.  [*See also* Exhibit A (*Examining Best Practices for Incarceration and Detention During COVID-19: Hearing Before the Senate Comm. on the Judiciary* (June 2, 2020) (joint statement of BOP Director Carvajal and BOP Medical Director Dr. Allen)).]

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement.  On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon

considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).

Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the CARES Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. *See* Exhibit B (Mem. for Director of Bureau of Prisons). Since March, BOP has placed an additional 7,695 inmates on home confinement. *See* bop.gov/coronavirus (last accessed on September 29, 2020).

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates

while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

### D.    Petite's Current Motion

Petite's motion requests a modification of her sentence under 18 U.S.C. § 3582(c)(1)(A).  [Doc. No. 181.]  She cites the same medical conditions as she cited in her prior motion for compassionate release, but adds that those conditions put her at increased risk for severe illness if

she were to contract COVID-19. [*Id.* at 3–4.] She says that she qualifies for compassionate release consideration under three subsections of the Sentencing Guidelines: U.S.S.G. §1b1.13 app. note 1(A), (B), and (D). [*Id.* at 7.] She also says that BOP has not adequately responded to the conditions created by the pandemic.[1] [*Id.* at 8, 15.]

Petite writes that she "has not exhausted her administrative remedies" related to her request for compassionate release. [*Id.* at 5.] She writes that the Court should excuse the procedural prerequisites to filing a motion for compassionate release because of her health condition and "the urgency of the circumstances." [*Id.*]

This Court ordered the United States to respond. [Doc. No. 182 (text-only order).]

## II.   Analysis

Petite's motion should be dismissed without prejudice because, as she writes in her motion, she has not met the procedural prerequisites to filing her motion. In the alternative, the Court should decline to reduce her sentence in its discretion.

---

[1] Petite is incarcerated at Aliceville FCI. As of the date of this response, BOP reports that there are seven inmates and eight staff members at the facility with active cases of COVID-19. It also reports that 18 inmates and nine staff members have recovered from the virus. *See* bop.gov/coronavirus.

## A.    Petite's Motion Is Not Properly Before the Court

Petite's motion is not properly before the Court.  Title 18 Section 3582(c)(1)(A) contains a mandatory claims-processing rule requiring defendants to first request that BOP file a motion on their behalf.  Petite writes that she has not pursued her request through BOP, so the Court should dismiss her motion without prejudice.

### 1.    Petite    Has    Not    Met    § 3582(c)'s    Procedural Requirements

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment once it has been imposed,' 18 U.S.C. § 3582(c); but the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  The defendant bears the burden to show eligibility for a modification of sentence.   18 U.S.C. § 3582(c)(1)(A); *Cannon v. United States*, 2019 WL 5580233, at *2 (S.D. Ala. Oct. 29, 2019); *see United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) ("[A] defendant, as the § 3582(c)(2) movant, bears the burden of establishing that a retroactive amendment has actually lowered his guidelines range in his case.").

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment.  Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. § 3582(c)(1)(A).  A court may grant the defendant's own motion for a

reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

BOP has issued regulations and a program statement governing requests to the Warden for compassionate release.   To "request" compassionate release based on an extraordinary or compelling reason, a defendant "shall" provide certain "minimum" information.   28 C.F.R. § 571.61(a).  The defendant must detail the extraordinary or compelling reasons that they believe justify release.   28 C.F.R. § 571.61(a)(1).   In addition, the defendant must include "[p]roposed release plans, including where the inmate will reside, how the inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment."   28 C.F.R. § 571.61(a)(2).

After BOP receives a request for compassionate release, the agency conducts an extensive assessment of the request.   Prior to approving a request for a reduced sentence, pursuant to agency policy and Department regulation, the BOP conducts a thorough evaluation of the circumstances underlying the request, including gathering and assessing all pertinent institutional, medical, and other personal records.   The

review is conducted by the warden of the institution where the inmate is confined; the BOP General Counsel; the BOP Medical Director and/or the Assistant Director of the Correctional Programs Division, depending on the nature of the request; and ultimately the Director of the BOP. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. The General Counsel also solicits the opinion of the United States Attorney in the district in which the inmate was sentenced. 28 C.F.R. § 571.62(a)(2). Finally, where an inmate's term of imprisonment is to be followed by a period of supervised release, the agency contacts the United States Probation Office for the district to which the inmate would be released to ensure the proposed release plan required by 28 C.F.R. § 571.61(a)(2) is appropriate and the location to which the inmate would be released comports with the terms of the inmate's supervised release. *See* BOP Program Statement 5050.50 at 14.

BOP's extensive review serves to ensure that the defendant's request meets the requirements for compassionate release. Evidence collected during the review sheds light on whether the request reflects extraordinary and compelling circumstances; the inmate's early release would not unduly minimize the severity of the inmate's offense; and the inmate's early release would not unduly jeopardize public safety, which

are all factors that must be taken into account by the Court under Section 1B1.13 of the Sentencing Guidelines and the BOP program statement.

Here, Petite candidly admits that she that she "has not exhausted her administrative remedies" related to her request for compassionate release.  [Doc. No. 181 at 5.]  At the outset, Petite's prior request for compassionate release does not make her current motion procedurally proper.  This Court recently concluded that it lacked authority to entertain a COVID-19-based motion for compassionate under these circumstances.  *United States v. Gray*, 2020 WL 2132948 at *6 (S.D. Ala. May 4, 2020) (DuBose, C.J.).  Gray had submitted a request to the Warden of her facility citing medical conditions as the basis for her early release.  *Id.* at *2.  Before this Court, however, she added that "possible exposure" to the COVID-19 pandemic in combination with her medical condition was another basis for her early release.  *Id.* at *6.  The Court denied Gray's motion for compassionate release on its merits insofar as it raised the same basis for that relief as stated in her request to BOP. *Id.* at *4–*5.  But it dismissed without prejudice Gray's new, pandemic-related claim.  *Id.* at *6.  In doing so, the Court made clear that Gray could submit a new request to the Warden based on the new circumstances and, if there were no answer after 30 days, file a new motion based on those new circumstances.  *Id.*

This Court is not alone in reaching the obvious conclusion that a motion for compassionate release in federal court must be on the same

basis raised in a request to the Warden.  After all, one of the purposes of behind the procedural requirements of § 3582(c)(1)(A) "is to give the BOP an opportunity to address the issue." *United States v. Valenta*, 2020 WL 1689786, at *1 (W.D. Pa. Apr. 7, 2020).  If the "evidence and arguments" underlying a defendant's motion were not "presented to the Bureau of Prisons first," the district court is not empowered to review the new evidence and arguments. *United States v. Jenkins*, 2020 WL 1872568, at *1 (D. Neb. Apr. 14, 2020).  Therefore, a defendant who has not "exhausted [their] administrative remedies regarding [their] complaint about COVID-19 . . . cannot properly bring [their] motion" to federal court. *United States v. Mollica*, 2020 WL 1914956 at *6 (N.D. Ala. April 20, 2020); *see also United States v. Rodriguez-Orejuela*, ___ F. Supp. 3d ___, 2020 WL 2050434 (S.D. Fla. April 28, 2020) (same); *United States v. Walls*, ___ F. Supp. 3d ___, 2020 WL 1934963 at *3 (E.D. Mich. April 22, 2020) (same); *United States v. Mogavero*, 2020 WL 1853754, at *2 (D. Nev. Apr. 13, 2020) (same).

Petite has not demonstrated that her motion is properly before the Court.  This Court should thus dismiss it without prejudice.

## 2. Section 3582(c)'s Procedural Requirements Are Mandatory Claim-Processing Rules

This Court cannot ignore § 3582(c)(1)(A)'s procedural requirements because they are mandatory claim-processing rules.  Claim-processing rules "seek to promote the orderly progress of litigation by requiring that

the parties take certain procedural steps at certain specified times." *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011).  Contrary to Petite's current arguments [Doc. No. 181 at 5], the claim-processing rules cannot be excused.

As several Courts of Appeals have concluded, § 3582(c)(1)(A)'s procedural requirements are "paradigmatic mandatory claim-processing rule[s].  *United States v. Franco*, ___ F.3d ___, 2020 WL 5249369 at *2 (5th Cir. Sept. 3, 2020); *United States v. Alam*, 960 F.3d 831,833–34 (6th Cir. 2020).  Section 3582 provides that a federal court "may not modify a term of imprisonment once it has been imposed."  18 U.S.C. § 3582(c).  But, it may modify a prison term on a defendant's motion subject to several requirements, including that the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or that the defendant has waited "30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."   18 U.S.C. § 3582(c)(1)(A).  That language is "mandatory."  *Franco*, 2020 WL 5249369 at *2.

The Court cannot excuse a defendant's failure to comply with § 3582(c)(1)(A)'s claims-processing rules.  "Because 'congress sets the rules' when it comes to statutory exhaustion requirements," the judiciary may not craft exceptions to those requirements unless "Congress wants [it] to."  *Alam*, 960 F.3d at 834 (quoting *Ross v. Blake*, 578 U.S. ___, 136 S. Ct. 1850, 1857 (2016)).  And, "[n]othing in § 3582(c)(1)(A) suggests the

possibility of judge-made exceptions." *Id.* Rather, "Congress used clear language," and "all requests for compassionate release must be presented to the Bureau of Prisons before they are litigated in the federal courts." *Franco*, 2020 WL 5249369 at *2.

When "properly invoked," mandatory claim-processing rules "must be enforced." *Hamer v. Neighborhood Hous. Servs. Of Chi.*, 583 U.S. ___, 138 S. Ct. 13, 17 (2017). The United States invokes the rule, so Petite's motion must be dismissed without prejudice.

## B.   Alternatively, the Court Should Deny Petite's Motion in its Discretion

Even if Petite's motion were properly before the Court, it should decline to reduce her sentence in its discretion. As a preliminary matter, the United States agrees that Petite's medical conditions put her at increased risk for severe illness if she were to contract COVID-19. The sealed medical records which accompanied the United States' response to Petite's prior motion corroborate that Petite has Type-II diabetes and a BMI of over 30. [*See* Sealed Exhibit to the United States' prior response, at 6, 29.] *See* Centers for Disease Control, *People with Certain Medical Conditions*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated September 11, 2020). If her motion were properly before the Court, then, she would be eligible for compassionate release consideration. U.S.S.G. §1B1.13 app. note 1(A)(ii).

16

However, the Court should find in the alternative that it would decline to reduce Petite's sentence in its discretion. If an inmate carries their burden to show an extraordinary and compelling reason to warrant a sentence reduction under § 3582(c)(1)(A), this Court then considers the sentencing factors in 18 U.S.C. § 3553(a) when deciding whether to exercise its discretion to grant their motion. 18 U.S.C. § 3582(c)(1)(A).

For Petite's conviction for conspiring to possess methamphetamine with the intent to distribute it, the Sentencing Guidelines recommended a sentence of between 324 and 405 months. [Doc. No. 85 at 12.] Ultimately, after considering the factors in 18 U.S.C. § 3553(a), the Court sentenced Petite to 150 months in prison. Her projected release date is in March of 2028. *See* bop.gov/inmateloc (Register Number 12611-003).

As the Court previously concluded, Petite has only served a small percentage of her sentence, and that sentence remains appropriate. [Doc. No. 180 at 11.] That conclusion remains true in response to her second motion. Petite's sentence is fair, appropriate, and necessary to deter crime and protect the community. 18 U.S.C. § 3553(a). It should not be modified.

## III. Conclusion

Petite has not carried her burden to show that her motion is properly before the Court, so it should be dismissed without prejudice. In the alternative, the Court should decline to reduce her sentence in its discretion.

17

Respectfully submitted,

RICHARD W. MOORE
UNITED STATES ATTORNEY
By:

*/s/ Oliver McDonald*
Oliver McDonald
Assistant United States Attorney
63 South Royal Street, Suite 600
Mobile, Alabama 36602
Telephone: (251) 441-5845
Fax: (251) 441-5277

## CERTIFICATE OF SERVICE

I certify that, on September 29, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically serve any counsel of record. Further, a copy of the foregoing was mailed on this date to: Dione Petite, No. 12611-003, FCI Aliceville, Satellite Camp, P.O. Box 487, Aliceville, Alabama 35442.

*/s/ Oliver McDonald*
Oliver McDonald
Assistant United States Attorney

EXHIBIT   A



# Department of Justice

STATEMENT OF

MICHAEL D. CARVAJAL
DIRECTOR
AND
DR. JEFFERY ALLEN
MEDICAL DIRECTOR
FEDERAL BUREAU OF PRISONS

BEFORE THE

COMMITTEE ON THE JUDICIARY
UNITED STATES SENATE

FOR A HEARING ON
EXAMINING BEST PRACTICES FOR INCARCERATION
AND DETENTION DURING COVID-19

PRESENTED
JUNE 2, 2020

**Statement of Michael D. Carvajal**
**Director, Federal Bureau of Prisons**
**And**
**Dr. Jeffery Allen**
**Medical Director, Federal Bureau of Prisons**
**Before the Committee on the Judiciary**
**United States Senate**
**June 2, 2020**

Good morning, Chairman Graham, Ranking Member Feinstein, and Members of the Committee.  You have asked me to come before you today to discuss the Bureau of Prisons' (Bureau's) mission and operations in response to the COVID-19 pandemic that is impacting our country, and indeed, the world.  The Bureau's response and management of COVID has received a great deal of Congressional, media, and stakeholder interest and scrutiny in the wake of this pandemic.  Much of this inquiry has been based on misinformation as to our response.  We appreciate this opportunity to discuss in person all that we have been doing to reduce risks and mitigate the impacts of the pandemic, and to keep our staff, inmates, and communities safe.

I was honored to be selected by Attorney General Barr to lead the Bureau and to work alongside the finest corrections professionals in the world.  I have spent 28 years in the Bureau, starting as a Correctional Officer, moving up through the ranks of Correctional Services to become a Warden, Regional Director, and now Director.  I was appointed to serve as the Bureau's eleventh Director on February 25, 2020, just about four weeks before the Bureau's first inmate COVID-19 positive case.  In these past three months, I have seen the Bureau's over 36,000 corrections professionals work tirelessly and with profound dedication toward their mission to protect the health and safety of inmates, fellow staff and the public.  I am keenly aware of the personal sacrifices these law enforcement officers make in fulfilling our important public safety mission.  The great work they do every day goes largely unseen by the general public.  Yet this inherently dangerous work helps keep our communities safe.  Many communities have been very supportive and appreciative of the difficult challenges our law enforcement personnel face and overcome even in the absence of this public health crisis.  Some communities support and applaud our staff as frontline heroes, and other communities have treated these brave staff and fellow citizens in a far less courteous manner, sometimes even accusatory or hostile.  Those latter reactions, albeit rare, are disappointing, and unwarranted.

The Bureau has a sound pandemic plan in place and a well-established history of managing and responding to communicable disease outbreaks, such as influenza.  We used this pandemic plan as a springboard for our COVID-19 response planning beginning in January, when our medical leadership began consulting with relevant experts, including the Centers for Disease Control and Prevention (CDC), the U.S. Public Health Service, the Office of Personnel Management (OPM), and the Office of the Vice President.  We leveraged and implemented guidance from these experts and used it in developing protocols for screening inmates and staff with potential exposure risk factors.  We have continued this strong collaboration, with our Medical Director and staff consulting on an almost daily basis with the CDC to ensure we are implementing best practices based on science and sound judgment, as the knowledge about and

response to the pandemic continues to evolve.  We have invited the CDC into our facilities and had them evaluate our work, which has been met with praise for our planning and implementation in the wake of a very vexing virus.  We continue to collaborate with the CDC in providing information to assist them in developing additional guidance for corrections professionals nationwide.

In order to be transparent about our plans, operations, and statistics, the Bureau has put together a detailed and thorough COVID-19 pandemic resource area on our public website at www.bop.gov/coronavirus.  The website is updated daily at 3 pm with our latest information as reported by the BOP's Office of Occupational Health and Safety.  In addition, the Bureau provides a weekly telephonic briefing for staff from the United States Senate and U.S. House of Representatives Judiciary and Appropriations Committees.

## CURRENT STATUS

The Bureau manages the health and treatment of approximately 149,000 inmates in BOP facilities and RRCs.  Over half of our institutions have no COVID-19 positive cases among inmates or staff.  Indeed, two-thirds of our positive cases are in just 7 of our 122 institutions nationwide.  As of June 1, 2020, across all facilities, there are 1,650 federal inmates who are currently COVID-19 positive based on test results. There are also currently 171 Bureau staff who have confirmed positive test results for COVID-19 nationwide, with 445 staff recovered and returning to work.

In total, from March 1, 2020, the date of the beginning of the national emergency proclaimed by President Trump, until today, 5,323 inmates total have tested positive for COVID-19 and to-date, 3,784 have recovered.  More than 80 percent of infected individuals have not become significantly ill.  The number of hospitalized inmates – those who became significantly ill – is currently only 83 in total.  And in fact, the number hospitalized is on a significant downward trajectory (see attached), suggesting that our attempts to mitigate the transmission of the virus is effective.  Regrettably, there have been 68 federal inmate deaths from COVID-19.

To-date, the Bureau's overall infection rate is approximately 4%, including clinically-probable and suspect cases, and based on the total number of inmates in custody.  The BOP's death rate of those infected is approximately 1.1% and is slightly lower than the US rate of 1.3%.  The BOP's rate of hospitalization has continued to decline over time with only 83 inmates currently hospitalized and only 22 of those on ventilators.

## PANDEMIC PLANNING

In response to the COVID-19 pandemic, the Bureau has taken, and will continue to take, aggressive steps to protect the safety and security of all staff and inmates, as well as members of the public.  Using the Incident Command System (ICS) framework, the Bureau developed, implemented, and updated an incident action plan that addresses our modified institution operations, Continuity of Operations Program, information technology readiness, supply management, inmate movement, inmate visitation, and official staff travel, as well as other important aspects of our operations.  In addition to the modifications we have already

undertaken, we continue to find innovative ways to continue to provide inmate programming to assist them with reentry.

The Bureau has also provided on an on-going basis detailed information about COVID-19 based on CDC guidance to inmates and staff on symptoms, transmission, preventative measures, and importance of reporting any potential symptoms to Health Services staff. We have an internal web-based system for tracking and monitoring infectious diseases and outbreaks, which leverages data from Bureau operational systems and facilitates the management of active cases for health care and correctional professionals system-wide. In all of our guidance, one simple preventative measure we have stressed is practicing good hygiene, as basic hygiene practices can be very effective in reducing the spread of germs. In addition, despite random reports of shortages, all institutions have ample cleaning products, disinfectant, and soap available and may procure additional supplies from a regional or national stockpile.

## PERSONAL PROTECTIVE EQUIPMENT

Initially, the Bureau was facing the same personal protective equipment (PPE) supply chain challenges as the rest of the country. We had appropriate amounts of PPE in our inventories, but we were concerned we would not be able to obtain additional needed supplies going forward as existing inventories dwindled. However, through scouring of available markets and use of emergency purchasing authorities, the Bureau successfully acquired a sizable stockpile of PPE. Each institution maintains a detailed inventory of PPE which is also monitored by our Emergency Operations Center in headquarters, to include N95 respirators, surgical masks, cloth face coverings, goggles/face shields, gloves, gowns, hand sanitizer, and cleaning supplies. In addition, each of our six regions maintains a regional stockpile, where items can be drop-shipped in one day to an institution that needs additional PPE. Note that initial CDC guidance was that face coverings were not recommended as a general measure. As the science evolved as to how the disease is transmitted, the CDC changed their guidance to recommend wearing face coverings. Within 24 hours of that change, we had provided face coverings to most of our staff and inmates. Within 72 hours, all of our inmates and staff were provided face coverings. To further augment our supplies, and consistent with the request of some congressional members, 15 Federal Prison Industries (FPI) factories were converted to PPE production for cloth face coverings, gowns, face shields, and hand sanitizer, allowing us to be more self-sustaining in production areas rather than burdening the public supply chain.

## INSTITUTION OPERATIONS

On March 13, 2020, in response to an increasing number of people with COVID-19 positive infections in various communities, the Bureau implemented an action plan to significantly limit movement in and out of our federal prisons. Almost all inmate internal — or Bureau-controlled — movement was suspended. There was some very limited inmate movement that was required, to include movements for forensic studies, writs, Interstate Agreements on Detainers, medical and mental health treatment, and transfer to RRCs or home confinement. New admissions to the Bureau from the USMS continued, as legally required. While we received criticism for that continued movement, it is critical to note that the criminal justice system did not stop processing criminal cases during the pandemic. Individuals in the community continue to commit crimes, arrests continue to be made, federal courts continue to

adjudicate and sentence offenders, and thus detainees and sentenced inmates continue to enter our system.  We are legally required to take these individuals from the Courts, and cannot control who the courts place into our system.  Some of these inmates are housed in Bureau detention facilities and jail units prior to sentencing, but the vast majority of them come to us from local jails or as voluntary surrenders.  Working with the Department of Justice, we attempted to slow the entrance of some of these new admissions until additional testing capability was acquired.

As a critical part of our plan to mitigate the transmission of COVID-19 throughout its facilities nationwide, the Bureau, in coordination with the U.S. Marshals Service (USMS), has decreased internal movement by 90%.  This action, along with the Bureau's implementation of a robust quarantine and isolation strategy for all new arrivals, was a bold and important short-term step to ensure the Department of Justice is protecting the health of the public, the staff, and the inmates in our custody to the greatest extent possible.

With the March 13 guidance, we also put in place, to the greatest extent possible within the prison environment, social distancing procedures.  As is widely noted, prisons are not designed for social distancing.  In fact, they are designed for just the opposite.  Nonetheless, we modified our operations to the extent we could to minimize co-mingling and group gathering.  We suspended social visiting as well, to decrease the flow of individuals from the community into the prison.  Understanding the importance of visitation to the inmate population, we significantly increased telephone minutes for the inmates from 200 to 500 minutes on March 13, 2020, and later, on April 8, 2020, in accordance with the CARES Act, we made telephone calls free for the inmate population.   We also made video-visiting, which we have available at our female facilities, free of charge.  The free telephone calls were clearly appreciated by the inmate population, as telephone minutes increased by nearly 50% the next day.  We are currently finalizing a regulation to formalize this program.

On March 26, 2020, we implemented enhanced daily monitoring, to include the cessation of movement for any inmate who screened positive for COVID-19.  On March 31, 2020, enhanced modified operations were introduced to further limit movement within the institution and enable maximizing social distancing while still allowing inmates access to critical resources, to include eating meals in their rooms or cells or in small groups within housing units, and limiting programmatic offerings to individualized or small group activities, and having Chaplains and Psychologists visit inmates in their housing areas.  We instituted requirements on April 7, 2020 for all inmates releasing from the Bureau or transferring to a RRC or Home Confinement to be placed on 14-day quarantine prior to their anticipated release or transfer.  These procedures remain in place to promote public safety.

As I noted above, throughout this pandemic the federal courts have continued to remand pre-trial detainees to federal custody nationwide and to sentence inmates who are in our detention sites to terms of federal incarceration.  As individuals continue to be remanded to Bureau detention sites, that capacity quickly fills.  To ensure those facilities do not become dangerously overcrowded – a situation that is not only a health risk but also creates safety and security risks - some limited inmate movement must continue.  As such, the Bureau and USMS will have to resume limited movement of inmates in order to appropriately manage the population within detention facilities to reduce risk.  Since ceasing most movement, there have

been 6,800 USMS inmates in state and local jails that require movement into the Bureau and another 7,000 inmates currently in Bureau custody who are pending regular movement to their designated facilities.

Effective May 18, 2020, the Bureau and the USMS began coordinating carefully to transport and transfer federal inmates into the Bureau's custody while taking proactive steps, including aggressive testing, to mitigate the transmission of COVID-19 into our environment.  The Bureau is testing all inmates upon arrival to our detention facilities, jail units, and quarantine/testing sites.  Furthermore, all inmates are tested prior to departing these facilities to ensure inmates are safely transported to their designated facilities.  As a second precaution, the Bureau will temporarily house all incoming inmates in one of three quarantine sites: FCC Yazoo City, Mississippi; FCC Victorville, California; and Federal Transfer Center, Oklahoma City, Oklahoma.  These inmates are tested again before moving to their final Bureau designated facility.

Further, regardless of COVID-19 planning and protocol, emergencies have and will continue to arise that require us to adapt changes to our procedures.  For example, in the midst of the diligent work Bureau staff were undertaking nationwide to counter the pandemic, on April 13, 2020, Federal Correctional Institution (FCI) Estill, South Carolina was struck by a tornado causing extensive damage to both the medium and minimum security institutions.  Despite the damage to the facilities, only five inmates sustained very minor injuries.  Over the ensuing four days, we were able to safely and securely move 842 inmates, relocating them to a prison in Pennsylvania that had available capacity.  We have plans in place to deal with situations such as these, and even with the complexities that the COVID-19 pandemic adds to the execution of those plans, the experience of FCI Estill on April 13 reflects just how well-trained and prepared our staff and leadership are to handle whatever the next crisis may be.

## HOME CONFINEMENT

As the pandemic grew more widespread, the Bureau began aggressively screening the inmate population for inmates who were appropriate for transfer to RRC or Home Confinement for service of the remainder of their sentences.  On March 26, 2020 and April 3, 2020, Attorney General Barr issued memoranda to the Bureau directing us to increase the use of Home Confinement, particularly at institutions that were markedly affected by COVID-19, for vulnerable inmates.  The CARES Act, signed by President Trump on March 27, 2020, further expanded our ability to place inmates on Home Confinement by lifting the statutory limitations contained in Title 18 U.S.C. § 3624(c)(2) during the course of the pandemic.  I am pleased to note that we currently have 6,120 inmates in RRC and 6,398 on Home Confinement. This is an 124% increase in HC from March 26, 2020.   There are an additional 985 who are scheduled to transfer to Home Confinement in the coming weeks.  While we continue to make robust strides in these placements to reduce risk of spread to the inmate population and staff, public health and safety must remain our highest priority.  The Attorney General has issued guidance as to which inmates should be considered for home confinement.  Staff are conducting individualized assessments to ensure inmates are appropriate for community placement both from a public safety perspective and given their own specific needs and circumstances.  Additionally, we must ensure inmates who release to Home Confinement have a viable residence in which to reside.

It should go without saying that while we are dedicated to the protection of our inmates' health and safety, we also have to consider—as the Attorney General's guidance emphasized— that inmates who presented a risk of public safety because of their criminal acts or other factors cannot be released.  Neither can we release inmates who would be worse off outside Bureau facilities than inside, such as those whose medical conditions could not be adequately cared for by health systems that are themselves overwhelmed by the response to COVID infections in the general community. Nor can we release inmates who do not have safe housing for themselves or housing that is not subject to appropriate safeguards for home confinement, which is still, after all, a form of incarceration for persons convicted of crimes whereby such persons are still serving a federal sentence.

## CONCLUSION

I am honored to speak on behalf of the Bureau, the staff in our 122 institutions, and our administrative offices nationwide.  Our mission is extremely challenging, but critical to the safety and security of the public, our staff, and the inmates we house.  I thank the staff who, like first responders everywhere, are working long hours to mitigate the spread of COVID-19 in our facilities.  The Bureau can be proud of this hard work, but we understand there is still more to do.

Chairman Graham, Ranking Member Feinstein, and Members of the Committee, this concludes my formal statement.



**Covid-19 Inmates in Treatment (in Hospital or in Isolation at a BOP Facility) Rate/5,000 Inmates by Day for BOP Operated Facilities**
**Approximately 10 Percent of Inmates in BOP Facilities Tested as of 6/1/2020**

# EXHIBIT  B



**Office of the Attorney General**
Washington, D. C. 20530

April 3, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU OF PRISONS

FROM:          THE ATTORNEY GENERAL

SUBJECT:    <u>Increasing Use of Home Confinement at Institutions Most Affected by
             COVID-19</u>

The mission of BOP is to administer the lawful punishments that our justice system imposes. Executing that mission imposes on us a profound obligation to protect the health and safety of all inmates.

Last week, I directed the Bureau of Prisons to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to our vulnerable inmates, while ensuring we successfully discharge our duty to protect the public. I applaud the substantial steps you have already taken on that front with respect to the vulnerable inmates who qualified for home confinement under the pre-CARES Act standards.

As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below.

I.    <u>**IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME CONFINEMENT OF ALL APPROPRIATE INMATES HELD AT FCI OAKDALE, FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED BOP FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING OPERATIONS**</u>

Memorandum from the Attorney General                                            Page 2
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions. I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations. You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems. And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates—not only those who were previously eligible for transfer.

For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. It is vital that we not inadvertently contribute to the spread of COVID-19 by transferring inmates from our facilities. Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community. I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.

Given the speed with which this disease has spread through the general public, it is clear that time is of the essence. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

## II.  PROTECTING THE PUBLIC

While we have a solemn obligation to protect the people in BOP custody, we also have an obligation to protect the public. That means we cannot simply release prison populations en masse onto the streets. Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses.

That risk is particularly acute as we combat the current pandemic. Police forces are facing the same daunting challenges in protecting the public that we face in protecting our inmates. It is impossible to engage in social distancing, hand washing, and other recommend steps in the middle of arresting a violent criminal. It is thus no surprise that many of our police officers have fallen ill with COVID-19, with some even dying in the line of duty from the disease. This pandemic has dramatically increased the already substantial risks facing the men and women who keep us safe, at the same time that it has winnowed their ranks while officers recover from getting sick, or self-quarantine to avoid possibly spreading the disease.

Memorandum from the Attorney General                                                   Page 3
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

I believe strongly that we should do everything we can to protect the inmates in our care, but that we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law enforcement officers who protect us all.